**FILED**

April 1, 2003

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

APR 1 7 2003

Judge Robert W. Gettleman
United States District Court

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| vs. | ) No. 03 CR 375 |
| | ) Judge Robert W. Gettleman |
| E. H. WACHS COMPANY | ) |

DOCKETED

APR 2 8 2003

## PLEA AGREEMENT

This Plea Agreement between the United States Attorney for the Northern District of Illinois, PATRICK J. FITZGERALD, and defendant, E. H. WACHS COMPANY, INC., and its attorneys, DANIEL E. REIDY and GREGORY S. OTSUKA, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure, and is governed in part by Rule 11(c)(1)(C), as more fully set forth in Paragraph 16, below.

This Plea Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 03 CR 375.

This Plea Agreement is limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state or local prosecuting, administrative or regulatory authorities except as expressly set forth in this Agreement, as more fully set forth in Paragraphs 17 and 18, below.

By this Plea Agreement, PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, and defendant, E. H. WACHS COMPANY, INC., and its attorneys, DANIEL E. REIDY and GREGORY S. OTSUKA, have agreed upon the following:

1.  Defendant acknowledges that it has been charged in Count

1



One of the information in this case with willfully violating the orders and regulations of the Comprehensive Trade and Investment Embargo Against Iran ("Iranian Embargo") prohibiting the exportation and transshipment of goods from the United States to Iran, without the required export authorization, in violation of Title 50, United States Code, Sections 1702 and 1705(b); Title 31 Code of Federal Regulations, Parts 560.203 and 560.204; and in Count Two of the information with willfully violating the Export Administration Regulations ("EAR") by exporting from the United States items subject to the EAR, with knowledge that the items were destined for Iran, without the authorization required under 15 Code of Federal Regulations §785A.4(b), in violation of 50 U.S.C. §§ 1702 and 1705(b), Title 15 Code of Federal Regulations Parts 787A.2 and 787A.4.

2.   Defendant has read the charges against it contained in the information, and those charges have been fully explained to defendant by its attorney.

3.   Defendant fully understands the nature and elements of the crimes with which defendant has been charged.

4.   Defendant will enter a voluntary plea of guilty to Count One and Count Two of the information in this case.

5.   Defendant will plead guilty because defendant is in fact guilty of the charges contained in Count One and Count Two of the information.   In pleading guilty, defendant admits the following facts and that those facts establish defendant's guilt beyond a reasonable doubt:

2

a.) As charged in Count One of the information, on or about July 10, 1995, at Wheeling, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant, E. H. WACHS COMPANY, INC., willfully violated the orders and regulations of the Iranian Embargo prohibiting the exportation and transshipment of items from the United States to Iran by exporting pipe cutters and related items from the United States through Canada and elsewhere, that is, defendant shipped the pipe cutters and related parts and items by truck from defendant's warehouse in Wheeling, Illinois, to Canada, and on to Iran, when employees of defendant were fully aware that the goods ultimately were destined for the National Iranian Gas Company ("the NIGC") located in Iran, without the required export authorization, in violation of 50 U.S.C. §§ 1702 and 1705(b); 31 C.F.R. §§ 560.203 and 560.204.

More specifically, in 1993 and 1994 the NIGC issued requests for quotations (also known as invitations to bid) to purchase approximately 50 pipe cutters and related blades and other items. The invitations to bid required that the successful bidder have an agent located in Iran in order to provide service for the pipe cutters and to provide training for NIGC personnel on the use of the cutters.

On November 23, 1993, defendant appointed Company X, a company located in Canada that has a subsidiary located in Iran, as defendant's exclusive dealer for Iran. The dealer agreement provided that defendant would pay Company X a 10% commission on all sales of defendant's goods made to companies located in Iran, even

3

if Company X did not participate in the transaction, and further provided that Company X was not to solicit sales for any other territory.

After becoming a dealer for defendant, Company X worked in concert with defendant to obtain the contract to sell the fifty cutters and related items to the NIGC. The original plan of defendant and Company X called for the items to be sold and shipped directly to the NIGC. To that end, Person A, one of defendant's officers and employees, obtained a price quote for the cost of shipping the items from Wheeling, Illinois, to Bandar Abbas, Iran by way of cargo freight aboard an ocean cargo ship.

The NIGC sought to obtain the following items, among others:

- 50 heavy duty, portable, pneumatic power driven, cold pipe cutting machines suitable for cutting 6 to 24 inch diameter gas pipe and for working in tropical conditions (temperatures ranging from -20° to +52° C or 2000 meters above sea level);

- 4 cutter reconditioners; and

-50 sets of spare parts for the pipe cutting machines for 2 years (2000 hours) of operation.

In advance of the pipe cutters order, in 1994 the NIGC initiated negotiations with Company X and defendant to purchase two Trav-L-Cutters from defendant to use to train NIGC employees. Person B, who was an International Sales Coordinator for defendant, conducted the negotiations on behalf of defendant. Because the two pipe cutters would be used only for training, the NIGC did not request that they include the optional anti-corrosive (atmospheric) package. On October 18, 1994, on behalf of the NIGC, Company X issued purchase order number 48/94 to defendant for 2

4

Model E Trav-L-Cutters and related parts at a price of $26,271. On November 8, 1994, Person B assigned sales order number 62860 to Company X's purchase order 48/94.

On May 6, 1995, President William J. Clinton issued Executive Order 12959 instituting an embargo against Iran, effective May 7, 1995. The Iranian Embargo prohibited the sale of items to Iranian entities and prohibited the export and reexport of items from the United States to Iran, either directly or indirectly. Certain of defendant's employees and operators were aware of the embargo and understood that the embargo made it illegal to sell or export items from the United States to Iran, the government of Iran or to Iranian entities, directly or indirectly through Company X or any other company, wherever located.

On or about May 18, 1995, the President of defendant sent a letter to the NIGC explaining that as a result of the embargo, defendant could not sell the pipe cutters and related items to the NIGC. The same day, however, Person A sent a letter to the NIGC instructing them to contact defendant's exclusive dealer for Iran, Company X, in all future communications.

Defendant, through certain of its employees and operators, including Person A and Person B, elected to continue with its plans to contract with the NIGC to sell pipe cutters and related items. In particular, Person A and certain employees and operators of defendant, along with Company X, decided to continue in the negotiations to send the pipe cutters to Iran, but to separate the 50-cutter order into smaller orders and redirect the route of the

5

shipments in order to give the appearance that the items were being sold and shipped to companies located in permissible non-embargoed countries other than the NIGC located in Iran. One such company was Company Y located in London, England.

On June 30, 1995, Person B caused to be issued invoice number 162350 for defendant's sale order number 62860 and Company X's corresponding purchase order number 48/94. The invoice was for the sale of two Trav-L-Cutters manufactured by defendant and related parts priced at $26,271 to the NIGC. On or about July 10, 1995, the two cutters and parts were shipped from Wheeling, Illinois, to Canada, where on July 13, 1995, the items were loaded on a ship for delivery to Bandar Abbas, Iran, arriving there on or about August 31, 1995. Defendant paid a 10% commission to Company X resulting from the sale of the two Trav-L-Cutters and related parts in order number 48/94.

The Iranian Embargo prohibited the shipment of the two cutters and related items from the United States to the NIGC located in Iran. Neither defendant nor anyone acting on behalf of defendant sought or otherwise obtained authorization from the Office of Foreign Assets Control for the shipment of these goods to Iran. The Office of Foreign Assets Control did not authorize the shipment of the goods to Iran.

b.) As charged in Count Two of the information, on September 11, 1996, defendant, E. H. WACHS COMPANY, INC., willfully violated the EAR by exporting from the United States items subject to the EAR, namely thirteen pipe cutters and related items, that is,

6

defendant shipped the thirteen pipe cutters and related items by truck from defendant's warehouse in Wheeling, Illinois, to Canada with knowledge that the items were destined for Iran, without the authorization required under 15 Code of Federal Regulations §785A.4(b), in violation of 50 U.S.C. §§ 1702 and 1705(b), 15 C.F.R. §§787A.2 and 787A.4.

On January 6, 1995, defendant issued the NIGC a formal quote of $4,669,643.90 for the 50 cutters and related items. The quotation was addressed to "National Iranian Gas Company" in "Tehran, Iran" and listed Iran as the ultimate destination. The quotation was prepared by and issued under the name of Person A on behalf of defendant. The price for the 50 cutters included an optional "atmospheric package," which, as requested by the NIGC, would make the cutters suitable for the tropical and harsh environment of Iran. Over the course of the next several months, representatives for the NIGC and defendant, through Person A and others, negotiated finalizing the particulars of defendant selling the requested items to the NIGC.

In violation of the Iranian Embargo, certain employees and operators of defendant, including Person A, Person B, Person C, and Person D, along with Company X decided to divide the NIGC request into smaller shipments and redirect the route of the shipments in order to give the appearance that the items were being sold and shipped to companies other than Company X. One such company was Company Y located in London, England.

On June 4, 1996, Company Y sent a letter to Person C

7

requesting that defendant issue a quotation for 14 heavy duty pipe cutters and other items. That same day Person B issued a quotation of $236,569.20 for the 14 pipe cutters and other items. Although not requested by Company Y, the quotation from Person B included the optional atmospheric package, as originally requested by the NIGC. The quotation listed Pakistan as the ultimate destination for the items, when in fact, as Person B well knew, Iran was the ultimate destination for the items. On June 6, 1996, following a request by Company Y for a greater discount, Person C, acting on behalf of defendant, reduced the quote to $197,141.25.

On July 4, 1996, Company Y sent a letter to Person C increasing its request to 19 cutters and other items, each item of which had been included in defendant's January 1995 quotation to the NIGC, including in particular the optional anti-corrosive (atmospheric) package for the 19 pipe cutters and 19 spare parts sets for two years (2000 hours) of operation. Company Y requested defendant to ship 13 pipe cutters and related items in late August 1996, and the remaining 6 pipe cutters and items in September 1996.

On July 10, 1996, Person C issued a quote of $477,133 for the 19 pipe cutters and related items, and on July 15, 1996, Company Y accepted the prices and directed defendant to commence production of the pipe cutters. Between July 17 and 23, 1996, Company Y paid defendant $212,701.94, and Person C sent Company Y a letter informing them that the amount paid would be applied to the total cost of the 19 pipe cutters. As agreed between defendant, through Person C, and Company Y, on or about September 11, 1996, defendant

8

shipped 13 of the 19 pipe cutters and related items, in bond, to a freight forwarder located in Canada. Two invoices were issued for the 13 cutters and parts, 10 cutters were included in invoice # 170045 in the amount of $209,744.23, and 3 cutters and parts were included in invoice # 170081 in the amount of $33,701.25.

On September 13, 1996, the 13 pipe cutters and related items were delivered to IWD Warehouse, located in Mississauga, Ontario, Canada, for WCB Freight Services, located in Toronto, Ontario, Canada. On September 23, 1996, the items were transshipped by Gillship Navigation aboard an ocean freighter from the port of Montreal to the port of Antwerp, Belgium. On October 21, 1996, N.V. Intership Europe, a freight forwarder, caused the items to be transported by truck from Antwerp to the NIGC located in Iran.

The Iranian Embargo prohibited the shipment from the United States to the NIGC in Iran of the thirteen pipe cutters and related items, which were subject to the EAR, within the meaning of Title 15, Code of Federal Regulations, §785A.4(b). Neither defendant nor anyone acting on behalf of defendant sought or otherwise obtained authorization from either the Office of Foreign Assets Control or the Bureau of Export Administration, now known as the Bureau of Industry and Security, for the shipment of these goods to Iran. Neither the Office of Foreign Assets Control nor the Bureau of Export Administration issued authorization for the shipment of these goods to Iran.

6. Defendant also acknowledges that for the purpose of computing its sentence under the U.S. Sentencing Guidelines, the

following conduct, to which it stipulates, constitutes relevant conduct under Section 1B1.3 of the Guidelines:

(a) In addition to the two shipments charged in Count One and Count Two of the information, as part of the fifty-cutter order, defendant made other unauthorized exports of items from the United States to the NIGC located in Iran. Specifically, between July 10, 1995, and February 10, 1997, defendant, operating in concert with other companies and with individuals located in Canada, Belgium, Germany, the Netherlands, the United Kingdom, the United Arab Emirates, and elsewhere, sold and exported the following items from the United States to the NIGC located in Iran:

| 1. | July 10, 1995 | Two Cutters & Parts (Count One) | $ 26,271.00 |
|---|---|---|---|
| 2. | Jan. 08, 1996 | Slitting Saw & Cutters | 666.40 |
| 3. | Feb. 14, 1996 | RH Pipe Beveler | 178.00 |
| 4. | June 12, 1996 | Ten Cutters & Parts | 225,873.34 |
| 5. | June 12, 1996 | Two Cutters & Parts | 22,882.50 |
| 6. | July 2, 1996 | Ten Cutters & Parts | 175,381.88 |
| 7. | Sept 11, 1996 | Ten Cutters & Parts (Count Two) | 209,744.23 |
| 8. | Sept 11, 1996 | Three Cutters & Parts (Count Two) | 33,701.25 |
| 9. | Dec 11, 1996 | Five Cutters & Parts | 54,574.85 |
| 10. | Dec 20, 1996 | Six Cutters & Parts | 80,815.00 |
| 11. | Jan 2, 1997 | Five Cutters & Parts | 92,248.00 |
| 12. | Feb 10, 1997 | Spare Parts | 53,100.30 |
| | | TOTAL | $975,436.75 |

In total defendant sold 53 pipe cutters, including 50 cutters with the optional atmospheric package, and related items through

10

various entities to the NIGC.

The Iranian Embargo prohibited each of the above listed shipments of pipe cutters and related items from the United States to the NIGC in Iran. Additionally, the pipe cutters and related items that were shipped between June 12, 1996, and February 10, 1997, to the NIGC were subject to the EAR, within the meaning of Title 15, Code of Federal Regulations, §785A.4(b). Neither defendant nor anyone acting on behalf of defendant sought or otherwise obtained authorization from the Office of Foreign Assets Control or from the Bureau of Export Enforcement for the shipment of these goods to Iran. Neither the Office of Foreign Assets Control nor the Bureau of Export Enforcement authorized the shipment of the goods to Iran.

(b)     In addition to the twelve shipments discussed above, as part of the fifty-cutter order for the NIGC, defendant procured for export and caused to be exported from Canada and England to the NIGC in Iran, pipe-cutting blades and saws. In particular, defendant's January 6, 1995, quotation to the NIGC included quantities of 500 each for 18 different types of pipe-cutting blades and saws, thus totaling 9,000 blades and saws listed at a price of $3,218,900 in defendant's January 6, 1995, quotation to the NIGC.

In the fall of 1995, Person D, an owner and operator of defendant, arranged with Company X to obtain 9,000 blades and saws for the fifty-cutter NIGC order. They specifically arranged to obtain 7,500 blades and saws from Supplier 1 located England.

11

Company X was to obtain the remaining 1,500 blades and saws from another supplier, Supplier 2. Person D and Company X agreed to have the 9,000 pipe-cutting blades and saws shipped to the NIGC in Iran. Later in the fall of 1995, Person D met with the business manager of Supplier 1 and informed him that Company X would arrange procurement of the pipe-cutting blades and saws from Supplier 1 and arrange the transportation of those blades and saws to the NIGC.

Between on or about May 9, 1996, and on or about October 31, 1996, Supplier 1 made four shipments totaling 7,500 blades and saws from England to the NIGC. The shipments consisted of 15 out of the 18 different types of blades and saws listed in defendant's January 6, 1995, quotation to the NIGC. Supplier 1 shipped 500 of each type of blade and saw.

Company X obtained from Supplier 2, 1,500 blades and saws, consisting of 500 each of the remaining 3 types of blades and saws listed in defendant's January 6, 1995, quotation to the NIGC. Between on or about May 9, 1996, and on or about October 31, 1996, Company X made four shipments totaling 1,500 blades and saws from Canada to the NIGC.

7. For purposes of applying the guidelines promulgated by the United States Sentencing Commission pursuant to Title 28, United States Code, Section 994, the parties agree on the following points:

(a) The parties agree pursuant to United States Sentencing Guidelines Sections 8C2.1 and 8C2.10 that there are no applicable guidelines governing the setting of fines for the

12

offenses alleged in Count One and Count Two of the information and that in assessing a fine for these charges the Court must be guided by the general statutory provisions governing sentencing found in Title 18, United States Code, Sections 3553 and 3572.

(b)   Because defendant has agreed in paragraphs 17 and 18 below, to pay the Office of Foreign Assets Control, U.S. Department of Treasury, $85,000.00 and to pay $159,000 to the United States Department of Commerce, in civil penalties assessed by those agencies, the parties agree that a criminal fine totaling $506,000 is consistent with the factors enumerated in 18 U.S.C. §§ 3553 and 3572 as relevant to the imposition of a fine.

(c)   The parties agree to waive a presentence investigation and report by the United States Probation Office. Defendant understands that this agreement to waive a presentence investigation and report is not binding on the Court, and that the Court may order the Probation Department to conduct its own investigation.   Defendant further understands that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final Sentencing Guidelines calculation.   Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations.

8.   Errors in calculations or interpretation of any of the guidelines may be corrected by either party prior to sentencing. The parties may correct these errors or misinterpretations either by stipulation or by a statement to the probation office and/or

13

court setting forth the disagreement as to the correct guidelines and their application. The validity of this Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw his plea on the basis of such corrections.

9.   Defendant understands the counts to which it will plead guilty, Count One and Count Two, each carry the following penalties per count: (a) a term of probation of at least one year and up to five years; and (b) a maximum fine of $500,000. Therefore the total penalty defendant faces is five years' probation and a maximum fine of $1,000,000.

10.   Defendant understands that in accord with federal law, Title 18, United States Code, §3013, upon entry of judgment of conviction, defendant will be assessed $400 on each count to which it has pled guilty, in addition to any other penalty imposed. Defendant agrees to pay the special assessment of $800 at the time of sentencing with a check or money order made payable to the Clerk of the U. S. District Court.

11.   Defendant understands that by pleading guilty it surrenders certain rights, including the following:

(a)   If defendant persisted in a plea of not guilty to the charges against it, defendant would have the right to a public and speedy trial. The trial could be either a jury trial or a trial by the judge sitting without a jury. Defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge

14

without a jury.

(b)   If the trial is a jury trial, the jury would be composed of twelve laypersons selected at random.  Defendant and its attorneys would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising so-called peremptory challenges.  The jury would have to agree unanimously before it could return a verdict of either guilty or not guilty. The jury would be instructed that defendant is presumed innocent, and that it could not convict defendant unless, after hearing all the evidence, and considering each count separately, it was persuaded of defendant's guilt beyond a reasonable doubt.

(c)   If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether or not the judge was persuaded of defendant's guilt beyond a reasonable doubt.

(d)   At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant.  Defendant would be able to confront those government witnesses and defendant's attorney would be able to cross-examine them.  In turn, defendant could present witnesses and other evidence in its own behalf.  If the witnesses for defendant would not appear voluntarily, defendant could require their attendance through the subpoena power of the court.

(e)   Defendant has knowingly and voluntarily executed separate waivers of the applicable statute of limitations that

15

would otherwise apply to and preclude the charges in the information in this case. Defendant understands that the written waivers extend the time period within which the government was allowed to prosecute the defendant for the offenses charged in the information to export pipe cutting equipment from the United States to Iran, in violation of the Iranian Embargo, and other federal laws and regulations. Defendant further understands that the validity of these waivers is not dependent on the signing, existence, or continued validity of this plea agreement.

(f) Defendant understands that it has a right to have the charges prosecuted by an indictment returned by a concurrence of twelve or more members of a legally constituted grand jury consisting of not less than sixteen and not more than twenty-three members. By signing this Agreement, defendant knowingly waives its right to be prosecuted by indictment and to assert at trial or on appeal any defects or errors arising from the information, the information process, or the fact that it has been prosecuted by way of information.

12. Defendant understands that by pleading guilty it is waiving all the rights set forth in the prior paragraph. Defendant's attorney has explained those rights to defendant, and the consequences of its waiver of those rights. Defendant further understands it is waiving all appellate issues that might have been available if defendant had exercised its right to trial. Defendant is also aware that Title 18, United States Code, Section 3742 affords a defendant the right to appeal the sentence imposed.

16

Acknowledging all of this, provided that the Court imposes the sentence set forth in paragraph 16, defendant knowingly waives the right to appeal any sentence within the maximum provided in the statutes of conviction (or the manner in which that sentence was determined) on the grounds set forth in Section 3742 or on any ground whatever, in exchange for the concessions made by the United States in this Plea Agreement. The waiver in this paragraph does not apply to a claim of involuntariness, or ineffective assistance of counsel, which relates directly to this waiver or to its negotiation.

13. Defendant understands that the information and this Plea Agreement are matters of public record and may be disclosed to any party.

14. Defendant understands that the United States Attorney's Office will fully apprise the District Court and the United States Probation Office of the nature, scope and extent of defendant's conduct regarding the charges against defendant, and related matters, including all matters in aggravation and mitigation relevant to the issue of sentencing.

15. Defendant agrees to fully and truthfully cooperate with the government in any matter that relates to the conduct discussed in paragraphs 5 and 6 herein, in which it is called upon to cooperate, at any time such cooperation is necessary. This cooperation will include:

(a) at the request of the government, providing any and all information, records, documents and oral communications that

17

the government would be able to obtain through subpoena;

(b) requesting and urging all E.H. WACHS companies, employees, former employees, owners, former owners, and agents, to fully and truthfully cooperate with the government in any matter in which it is called upon to cooperate, at any time such cooperation is necessary, including providing complete and truthful information in any investigation and pretrial preparation, and complete and truthful testimony, if called upon to testify, before any federal grand jury and United States District Court proceeding, and any related civil administrative or court proceedings;

(c) at the request of the government, waiving its attorney-client privilege with regard to any oral communications and written communications, records and documents relating to any investigation of violations of the Iranian Embargo and related matters; and

(d) at the request of the government, providing a records custodian to identify documents and to fully and truthfully cooperate with the government in any matter in which it is called upon to cooperate, at any time such cooperation is necessary, including providing complete and truthful information in any investigation and pretrial preparation, and complete and truthful testimony, if called upon to testify, before any federal grand jury and United States District Court proceeding, and any related civil administrative or court proceedings.

16. The government and defendant have agreed, pursuant to Fed.R.Crim.P. 11(c)(1)(C), that the appropriate disposition of this

18

case shall included a criminal fine of $253,000 on Count One of the information in this case, and a criminal fine of $253,000 on Count Two of the information, for a total criminal fine of $506,000, which the defendant shall pay in full within 14 days of the guilty plea, and that defendant should be put on probation for a period of twenty-four months with a special condition of probation that within 60 days of the execution of this agreement defendant shall demonstrate that it has instituted a corporate compliance plan to prevent future violations of the export laws and shall provide a copy of the compliance program to the Bureau of Industry and Security for review, and as a further condition of probation that defendant not violate any of the laws of the United States, including the export laws. If the Court accepts and imposes the agreed criminal fine and term of probation set forth, defendant may not withdraw this plea as a matter of right under Federal Rule of Criminal Procedure 11(c)(5) and (d). If, however, the Court refuses to impose the agreed criminal fine and term of probation set forth herein, thereby rejecting the Plea Agreement, or otherwise refuses to accept defendant's plea of guilty, this Agreement shall become null and void and neither party will be bound thereto.

17. As a further condition of this agreement, in addition to the criminal fine, defendant will pay the Office of Foreign Assets Control, U.S. Department of Treasury, within 15 days of the date of sentencing a cashier's check in the amount of $85,000.00 in full satisfaction of any and all civil penalties assessed or to be

assessed by that agency, pursuant to Title 50, United States Code, Section 1705(a), for the conduct set forth in Count One and Count Two of the information and the factual basis provided in paragraphs 5 and 6 above, as follows:

| SHIPMENT DATE | SHIPMENT VALUE | FINE AMOUNT |
|---|---|---|
| July 10, 1995 | $ 26,271.00 | $10,000.00 |
| Jan. 08, 1996 | 666.40 | 800.00 |
| Feb. 14, 1996 | 178.00 | 200.00 |
| June 12, 1996 | 248,755.84 | 10,000.00 |
| July 02, 1996 | 175,381.88 | 10,000.00 |
| Sept 11, 1996 | 209,744.23 | 10,000.00 |
| Dec. 11, 1996 | 54,574.85 | 11,000.00 |
| Dec. 20, 1996 | 80,815.00 | 11,000.00 |
| Jan. 02, 1997 | 92,248.00 | 11,000.00 |
| Feb. 10, 1997 | 53,100.30 | 11,000.00 |
| | TOTAL FINE | $85,000.00 |

Defendant agrees not to contest at any future date the settlement described in this paragraph and to hold the Office of Foreign Assets Control and its employees harmless from any and all claims arising from or connected with the imposition of civil penalties. While OFAC is not a signatory to this agreement, the U.S. Attorney has received the specific approval of OFAC to execute this agreement and OFAC understands that it is bound by the terms hereof.

18. Defendant agrees to enter the attached Settlement Agreement with the United States Department of Commerce. A true copy of such Settlement Agreement is attached hereto as Exhibit 1 and is incorporated herein by this reference as if fully set forth here in full. In addition to the other terms of the Settlement Agreement, defendant agrees to pay $159,000 to the United States Department of Commerce, within fourteen days of the guilty plea.

20

19. The United States agrees not to seek additional criminal charges in the Northern District Of Illinois against defendant for the events between May 7, 1995, and the date of the execution of this plea agreement relating specifically to the shipment of defendant's Trav-L-Cutters and related items to the NIGC, as discussed in paragraphs 5 and 6 of this plea agreement, which occurred in the Northern District of Illinois.

20. At the time of the entry of the pleas of guilty, defendant shall file with the Court copies of appropriate corporate resolutions adopted by the Board of Directors of E.H. WACHS authorizing the entry of the guilty pleas described above, and compliance with all of the other terms of this plea agreement.

21. Defendant understands that its compliance with each part of this Plea Agreement extends throughout and beyond the period of its sentence, and failure to abide by any term of the Plea Agreement is a violation of the Agreement. Defendant further understands that in the event it violates this Agreement, the government, at its option, may move to vacate the Plea Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or to resentence defendant. Defendant understands and agrees that in the event that this Plea Agreement is breached by defendant, and the Government elects to void the Plea Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance

21

with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

22. Defendant agrees that its obligations under this Plea Agreement survive any change in its corporate name, form or status.

23. Defendant and its attorneys acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty.

24. Defendant agrees this Plea Agreement shall be filed and become a part of the record in this case.

25. Defendant acknowledges that it has read this Agreement and carefully reviewed each provision with its attorneys. Defendant further acknowledges that it understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: _17 April 2003_

PATRICK J. FITZGERALD
United States Attorney

GEORGE JACKSON III
Assistant United States Attorney

E. H. WACHS COMPANY, INC.
Defendant

by _____
DANIEL E. REIDY
Attorney for
Defendant

GREGORY S. OTSUKA
Attorney for
Defendant

_MJ Druel CFU_
_E H Wachs Co._